COMMISSIONER OF INTERNAL REVE-
NUE v. NATIONAL RESERVE INS. CO.
No. 11417.

Circuit Court of Appeals, Ninth Circuit.
April 3, 1947.

Sewall Key, Acting Asst. Atty. Gen., Helen R. Carloss, Helen Goodner and Hilbert Zarky, Sp. Assts. to the Atty. Gen., for petitioner.

Alfred C. Lockwood, Z. Simpson Cox, Lorna E. Lockwood and L. J. Cox, Jr., all of Phoenix, Ariz., for respondent.

Robert Ash, of Washington, D. C., for Texas Ass'n of Mutual Life Ins. officials, amicus curiæ.

Allan K. Perry, of Phoenix, Ariz., amicus curiæ.

Before DENMAN, STEPHENS, and BONE, Circuit Judges.

DENMAN, Circuit Judge.

The Commissioner seeks review of a decision of the Tax Court holding that the appellee, an Arizona corporation issuing policies of insurance on the assessment plan, hereinafter called the Company, was a life insurance company within the definition of Section 201(a) of the Internal Revenue Code, 26 U.S.C.A.Int.Rev.Code, § 201, and hence not liable for income tax deficiencies found by the Commissioner for the tax years 1939 and 1940 to be due on its income from assessment receipts for those years.

The Commissioner found that the Company was a mutual insurance company taxable under Section 207 of the Internal Revenue Code, 26 U.S.C.A.Int.Rev.Code, § 207.

The Company does not contest this finding of the Commissioner if it be not a life insurance company within Section 201(a).

The net taxable income of a life insurance company is the gross income from interest, dividends and rents less, inter alia, the amount placed in its reserve fund, described in Section 203(a) of the Revenue Code, 26 U.S.C.A.Int.Rev.Code, § 203.[1]

Section 201(a) of the Code provides, "Sec. 201. Tax on life insurance companies

"(a) Definition. When used in this chapter the term 'life insurance company' means an insurance company engaged in the business of issuing life insurance and annuity contracts (including contracts of combined life, health, and accident insurance), the reserve funds of which held for the fulfillment of such contracts comprise more than 50 per centum of its total reserve funds."

The Company has a reserve fund for such insurance contracts and the Commissioner concedes that it exceeded the 50 per cent required by Section 201(a) for the years 1939 and 1940. The sole question on this appeal is whether the fund was "held for the fulfillment of such contracts."

The Company admits its mortuary fund, which it claims complies with Section 201 (a), supra, was created by it under the Arizona law, its policies and by-laws. The Tax Court's findings show that this mortuary fund so created was held to pay policy claims and expenses incidental thereto; in addition it found it was held to (a) pay attorney's fees and the necessary expense of handling a contested or disputed claim; (b) make the deposit with the State Treas-

---

[1] "Sec. 203. Net income of life insurance companies.

"(a) General rule. In the case of a life insurance company the term 'net income' means the gross income less—* * *

"(2) Reserve funds. An amount equal to 4 per centum of the mean of the reserve funds required by law and held at the beginning and end of the taxable year, except that in the case of any such reserve fund which is computed at a lower interest assumption rate, the rate of 3¾ per centum shall be substituted for 4 per centum * * *". (Emphasis supplied.)

Sec. 202(b) provides, "(b) Reserve funds required by law, defined. The term 'reserve funds required by law' includes, in the case of assessment insurance, sums actually deposited by any company or association with State or Territorial officers pursuant to law as guaranty or reserve funds, and any funds maintained under the charter or articles of incorporation of the company or association exclusively for the payment of claims arising under certificates of membership or policies issued upon the assessment plan and not subject to any other use." 26 U.S.C.A. Int.Rev.Code, § 202.

urer required by Arizona law which was subject to a lien of all the Company's creditors; (c) pay for the expense of organizing a legal reserve life insurance company; (d) make refunds to policy holders of excessive premiums, in the nature of dividends, and (e) apply the interest earned by the assets in the fund to payment of general expenses.

■ (A) The Commissioner claims that the phrase "fulfillment of such contracts" does not include the legal expenses in determining whether their fulfillment requires payment. Such expenses he contends are but the necessary business of an insurance company. However, the applicable Treasury Regulations indicate the contrary. Treasury Regulations 103, Section 19.201 (a)–1 provides that the reserve referred to in Section 201(a) of the Revenue Code must conform with Section 19.203(a) (2)–1 of the Regulations defining "Reserve funds."

With respect to the business expenses, the latter section provides that the reserve "does not include reserves required to be maintained to provide for the *ordinary running expenses* of a business definite in amount, and which must be *currently paid by every company from its income* if its business is to continue, such as taxes, salaries, reinsurance and unpaid brokerage; * * *." (Emphasis supplied.)

It seems inconceivable that if the Treasury regarded the attorney's fees in determining whether the "fulfillment" of the "contracts" of insurance as not a part of such fulfillment, but were "ordinary running expenses" "currently paid," it so would have stated in this Regulation. This interpretation is fortified by the other succeeding specific exemptions from payment from the reserve of " * * * the reserve or net value of risks reinsured in other solvent companies to the extent of the reinsurance; reserve for premiums paid in advance; *annual and deferred dividends;* accrued but unsettled policy claims; losses incurred but unreported; liability on supplementary contracts not involving life contingencies; estimated value of future premiums which have been waived on policies after proof of total and permanent disability." (Emphasis supplied.)

(B) The Commissioner contends that the moneys of the Company's reserve deposited in the State Treasury amounting to $2,000 in 1939 and $2,789.47 in 1940, are not held for the fulfillment of the insurance contracts. This deposit of part of the reserve with the state Treasurer is required by Section 53-605(a), (b) and (e) of the Arizona Code.[2]

However, such deposit is not exclusively for the fulfillment of the insurance contracts, for under Sec. 53-605(d) "Any unsettled final judgment of a court of this state shall be a lien on the deposits of money or securities prescribed by section 608b [§ 53-605], and subject to execution after thirty (30) days from entry of final judgment. If said deposit is depleted thereby

---

2 "53-605. **Deposit of money or security.**—(a) Every benefit corporation organized or operating under the provisions of this act, before receiving a certificate of authority to transact business, shall, in addition to the requirements of section 609b [§ 53-611], deposit with the state treasurer, to be by him held in trust for the benefit and protection of the corporation's members, the sum of one thousand dollars ($1,000). Thereafter a further sum of one thousand dollars ($1,000), divided into twelve (12) equal monthly payments, beginning thirty (30) days after the certificate of authority is issued, shall be likewise deposited with the state treasurer. Failure to pay any such monthly payment shall automatically cancel the corporation's certificate of authority.

"(b) In addition to said deposits every such corporation shall, not later than February 1, 1940, and on or before February 1 of each year thereafter, deposit with the state treasurer, to be by him held in trust as hereinafter provided, for the benefit and protection of the members of the corporation, a further sum equal to one dollar ($1.00) for each one thousand dollars ($1,000) of protection in force on December 31 of the preceding year, beginning as of December 31, 1939, until a total of ten thousand dollars ($10,000) has been so deposited. * * *

"(e) Said deposit may be considered as a part of any required reserve of the corporation and shall not be subject to withdrawal so long as the corporation has any contract or other liability outstanding. * * *"

it shall be replenished within ninety (90) days." "Any" final judgment well could be one for $100,000 arising from the negligent killing of four occupants of an automobile in a collision with the Company's automobile engaged in business of the Company in which the latter's agent is at fault. Such complete wiping out of this portion of the reserve could in no sense be a fulfillment of the insurance contracts.

The "guaranty or reserve funds" deposited with state officials under Sec. 202 (b), supra, we consider to be ejusdem generis with the succeeding "funds" there described as "any funds maintained under the charter or articles of incorporation of the company or association exclusively for the payment of claims arising under certificates of membership or policies issued upon the assessment plan and not subject to any other use." The funds so deposited with the Arizona treasurer do not comply with Treasury Regulations 103, sec. 19.203(a)–1, supra.

(C) Under the Company's by-laws its mortuary reserve fund is also held subject to pay for the expense of organizing a different company—a legal reserve company. We agree with the Tax Court's Judge Disney's dissenting statement that "I am altogether unable to comprehend how a mortuary fund, subject to be drawn upon to set up a legal reserve life insurance company can be said to be held for the fulfillment of the insurance contracts." It is noted that the majority opinion did not even mention this important fact.

The circumstance that the fund may not have been debited in the taxable years with the expenses of organizing a legal reserve company is irrelevant. The mortuary fund was established and was "held" to pay such expenses, whether or not any were incurred during a particular year.

(D) Article XVI of the Company's by-laws required the directors to issue each year to each member whose payments had not lapsed a certificate showing the member's share in the savings in the mortuary fund. Under this provision the Company was required by the Arizona Corporation Commission to make re-funds to policyholders of premiums collected in excess of the cost of insurance out of the mortality fund, and the amounts so refunded ($1,597.93 in 1939 and $4,154.18 in 1940) were treated in its books as dividends. Quite clearly a fund subject to be depleted by the amounts of excess premiums in the nature of dividends is not a reserve fund held for fulfillment of insurance contracts. Compare the cases which decide that a reserve held to pay dividends or coupons representing dividends to policyholders are mere liability or solvency reserves and not life insurance reserves in the technical sense. New York Life Ins. Co. v. Bowers, 283 U.S. 242, 51 S.Ct. 399, 75 L.Ed. 1005; Helvering v. Inter-Mountain Life Ins. Co., 294 U.S. 686, 55 S.Ct. 572, 79 L.Ed. 1227; Helvering v. Montana Life Ins. Co., 9 Cir., 84 F.2d 623; Continental Assur. Co. v. United States, 8 F. Supp. 474, 79 Ct.Cl. 756; Massachusetts Mut. Life Ins. Co. v. United States, 56 F.2d 897, 74 Ct.Cl. 162; Minn. Mutual Life Ins. Co. v. United States, 66 Ct.Cl. 481, certiorari denied 279 U.S. 856, 49 S.Ct. 352, 73 L.Ed. 998; Equitable Life Assurance Society v. Commissioner, 33 B.T.A. 708, 716, 717; Midland Mut. Life Ins. Co. v. Commissioner, 19 B.T.A. 765. See Section 19.203(a) (2)-1 of Treasury Regulations 103, which provides that the term reserves does not include amounts maintained for annual and deferred dividends.

The Tax Court seems to have recognized that the payment of these dividends from the mortuary fund was not a payment to fulfill contracts. However, it attempted to justify its holding that the mortuary fund was held to fulfill contracts on the theory that the payment of dividends did not in fact reduce the reserve in the taxable years below legal requirements. But this, of course, is immaterial to the issue under the statute. Since the Company maintained only one "reserve" fund, its mortuary fund, and since this fund was subject to invasion for premium refunds, it does not meet the statutory test which specifies a reserve fund held only to fulfill contracts.

(E) Section 53-609(b) of the Arizona Code permitted the interest earned by the assets of the corporation, whether

deposited with the State Treasurer or otherwise invested, to be used for general operating expenses. No exception is made of interest earned on the assets set aside in a reserve fund. This authorizes use of the mortuary fund for such expenses, for the reason that interest earned by the assets comprising a reserve fund is considered as a part of the fund. The classic definition of a reserve fund, stated in Maryland Casualty Co. v. United States, 251 U.S. 342, 40 S.Ct. 155, 64 L.Ed. 297, and incorporated in Section 19.203(a) (2)-1 of Treasury Regulations 103, is that it is a sum of money, variously computed or estimated, which with *accretions from interest*, is set aside to mature or liquidate future unaccrued and contingent claims. The regulation also states that only funds dependent upon interest earnings for their maintenance will be considered as reserves. And Congress has always considered interest on the reserve fund as of the same character as the principal of the fund, so far as protection for policyholders is concerned. See for a full discussion, Commissioner v. Monarch Life Ins. Co., 1 Cir., 114 F.2d 314. See also Helvering v. Oregon Ins. Co., 311 U.S. 267, 269, 61 S.Ct. 207, 85 L.Ed. 180; Massachusetts Mut. Life Ins. Co. v. United States, 56 F.2d 897, 899, 74 Ct.Cl. 162.

While Jones v. Oklahoma Ben. Life Ass'n., 10 Cir., 151 F.2d 505, held that authority to use the interest earned by the fund involved in that case for general expenses did not prevent the fund from qualifying as a reserve fund held to fulfill contracts, this conclusion was reached because (at page 509) "Under the Oklahoma statutes and the by-laws of the Association, interest earned by the emergency fund of the Association does not accrue to the fund and is no part thereof. Hence, use of the interest for expenses cannot be said to be a use of the fund."

In the instant case Section 53-609(b) of the Arizona Code does not provide that interest earned shall not be part of the mortuary or reserve fund. Nor does the Company's by-laws so provide. Article XVI of the Company's by-laws merely prescribes a death benefit fund and an expense fund, but does not stipulate that all interest earned shall go into the expense fund. On the contrary, it is stated that the expense fund shall consist of *only* membership and registration fees, first month's payments of assessments and reinstatements, 50 per cent of the following eleven months' payments and 33-1/3 per cent of all subsequent payments, thus excluding interest earned by the mortuary fund.

■ The power to use interest earned by the assets in reserve for general expenses constitutes an authority to use the mortuary fund for such a purpose and prevents the fund from meeting the criteria for a reserve fund contemplated by the statutory definition.

■ The Company contends that since in neither tax years was its reserve for the "fulfillment" of its policy claims an amount less than the 50 per cent of its total reserve, fund, it has complied with Section 201(a) of the Code. We do not agree. The fund was held for these five other purposes and hence not for the exclusive purpose of the fulfillment of the obligations of the policies. It is immaterial that possible drains on the reserve did not happen so to reduce it below its minimum in these particular years.

The Tax Court is in error in holding that the Company was a life insurance company taxable under Section 201(a) of the Code and in determining its tax as a mutual insurance company under Section 207.

The decision of the Tax Court is reversed.